UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | No. 3:11-00146 |
| v. | ) | Judge Sharp |
| RICHARD FLETCHER, | ) | |
| Defendant. | ) | |

### MEMORANDUM

Pending before the Court is Defendant Richard Fletcher's *Motion to Suppress* (Docket Entry No. 21). The parties have fully briefed the issue, and the Court held an evidentiary hearing on March 29, 2012.

### I. FACTUAL BACKGROUND

During the course of the evidentiary hearing, the Court heard conflicting and sometimes inconsistent testimony from the witnesses. Among a multitude of other reasons bearing on his credibility, the Court finds Defendant's testimony unpersuasive in light of the proof regarding his perceptual state at the time of the October 15, 2010 encounter. During the hearing, Defendant testified as follows:

> Q. [by Asst. U.S. Attorney Clay T. Lee] Had you smoked marijuana earlier on the day that this incident occurred?
>
> A. [by Defendant Fletcher] I had smoked earlier that day and I had smoked before the incident with the police officer.
>
> Q. You were high when this happened?
>
> A. Yes. Very high.
>
> Q. So when you're high, how is your memory?

1

A. I mean, I remember some things when I'm high.

Q. So your memory isn't as sharp when you're high on drugs?

A. No.

Q. But your testimony here today is that you remember clearly what happened in this incident?

A. From my best of knowledge.

Q. But you were very high, by your own admission.

A. Yes, I was high.

(Docket Entry No. 35, Suppression Hearing Transcript ("SH Transcript") at p. 109).

Having reviewed the record, the exhibits and stipulation received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court finds the following to be facts relevant to the pending motion. Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts, that which it deems to be immaterial to the issues presented by Defendant's *Motion to Suppress*.

On October 15, 2010, at approximately 12:42 a.m., Officer Christopher Hawk ("Officer Hawk") of the Metro Nashville Police Department ("MNPD"), on routine patrol, entered the parking lot of Carter Lawrence Magnet School, located at 1118 12th Avenue South, Nashville, Tennessee. While driving through school grounds, Officer Hawk observed Defendant walking nearby in the school parking lot. Officer Hawk drove his police car to the area where Defendant was located, trained his vehicle's external light upon Defendant, and exited his vehicle. No blue-lights were activated.

Officer Hawk observed that Defendant was walking away from the officer's location and that Defendant's hands appeared to be in the front pockets of either his sweatshirt or pants.

Officer Hawk asked Defendant "something to the effect of, Could you come over here and talk to me?" Defendant "shrugged his shoulders, as if he was hesitating or maybe sighing." Officer Hawk testified, "then [Defendant] had a movement with both his hands under his hoodie on his right side, like he was holding something heavy or adjusting something; at which point he turned counterclockwise around, with his right-hand side away from me to face me." Defendant walked towards Officer Hawk who related the event as follows:

> I asked him to take his hands out of his pockets and show them to me; at which point he took his left hand out of his pocket and raised it up. Like here it is. And he left his right hand inside his pockets or under the hoodie, concealed...At this point he was still walking towards me, but he remained—refrained to take his right hand out of his pocket. And I asked him a little more direct. Take your hands, you know, out of your pocket. Let me see your right hand. And he refused to do it, still holding his left hand up...Then he kept walking towards me and got within an arm's distance away. And I told him, Take your hand out of your pocket now, or something to that effect. I made it a command for him to take his hand out of his pocket, and he still refused to.

Officer Hawk considered the third request for Defendant to show his hands to be a command. Officer Hawk commanded Defendant to remove his hand from his pocket "because of the way he shifted his right side before he turned towards me. I didn't know what he had concealed on him. And I—For safety reasons, I wanted to see both of his hands." Officer Hawk could not recall asking for or receiving consent to search Defendant's body; however, Officer Hawk testified that "[t]he arrest report I wrote immediately after the incident says that I asked for consent." After the third time Officer Hawk requested that Defendant remove his hand from his pocket, he grabbed Defendant's right arm above the wrist "to make sure he didn't pull anything out."[1] Defendant then began to struggle with the officer. During the struggle, Officer Hawk

---

[1] Defendant argues that he had on big saggy jeans that night, and he used his right hand to hold up his pants. *See* (Docket Entry No. 39 at 4). Although irrelevant, Defendant further argues the style of pants he was wearing is common in the Rose Park area. *Id.* The Court would note that, in addition to his pants being baggy, Defendant testified that the gun was weighing down his pants. *See* (Docket Entry No. 35, Suppression Hearing Transcripts at pp. 106-107).

3

radioed for back-up and Defendant dropped to the ground in front of Officer Hawk's police car. Officer Hawk felt Defendant's right hand engage in something similar to a pitching motion.

After Defendant performed this pitching motion, he ceased to struggle and Officer Hawk gained control of Defendant and placed him in handcuffs. Defendant asked why he was being handcuffed. Officer Hawk replied "something to the effect of, well, trespassing for one, for a beginner." Officer Hawk testified that trespassing is prohibited upon Carter Lawrence Magnet School property and that it is clearly marked as such.[2]

Upon back-up units arriving at the scene, officers located a Taurus .45 caliber pistol from beneath Officer Hawk's police vehicle. Officer Hawk testified that he believed that the pitching motion he felt with Defendant's right hand was caused by Defendant tossing the gun under his car. Officer Hawk also testified that carrying a firearm on school grounds is a crime and that persons are not permitted upon Metro Park's property after the hours of 11:00 p.m.

On July 21, 2011, a federal grand jury returned an Indictment against Defendant alleging violations of 18 U.S.C. §§ 922(g)(1) and 924. This charges Defendant with "previously being convicted in any court of a crime punishable by imprisonment for a term exceeding one (1) year, did knowingly possess, in and affecting commerce, a firearm, to wit: a Taurus, Model Ultra Lite, .45 caliber/ .410 gauge long colt revolver." (Docket Entry No. 1).

## II. ANALYSIS

Defendant seeks to suppress the firearm recovered as a result of the encounter between Defendant and Officer Hawk on October 15, 2010, in the parking lot of Carter Lawrence Magnet School in Nashville, Tennessee. Defendant contends that the encounter with Officer Hawk was

---

[2] Michelle Hendrix ("Hendrix"), an investigator for the Federal Public Defender's Office, testified that she had researched and investigated the Rose Park area. Hendrix testified that Carter Lawrence Magnet School property is marked with two "No Trespassing" signs. It was Hendrix's belief that a pedestrian can walk unimpeded onto the Carter Lawrence school grounds without encountering any "No Trespassing" signs, when entering from numerous pedestrian-only access points both from Rose Park Metro park and from the surrounding streets.

an illegal seizure because Officer Hawk lacked legal justification to stop Defendant and that all evidence obtained from the seizure is tainted and must be suppressed. *See* (Docket Entry No. 39 at 13).

The Government counters that the firearm recovered in this case was the result of an initially consensual encounter between law enforcement and that based upon Defendant's behavior and the totality of the circumstances, evolved into a lawful investigatory detention resulting in the recovery of a firearm. Because the encounter was entirely proper, the Government contends Defendant's *Motion to Suppress* should be denied. *See* (Docket Entry No. 40 at 1).

"Encounters between police officers and citizens can be grouped into three categories: 'consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause.'" *United States v. Campbell*, 2007 WL 1501281 at * 3 (6th Cir. 2007) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)).

The first relevant question here is whether a seizure occurred. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (quoting *Terry v. Ohio,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868). This test is met when the citizen's "freedom of movement is restrained." *Id.* at 553, 100 S.Ct. 1870. However, an encounter is consensual, and therefore falls short of a seizure, "[s]o long as a reasonable person would feel free to disregard the police and go about his business." *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quotation marks and

citation omitted). An analysis of consent requires "taking into account all of the circumstances surrounding the encounter." *Id.*; *see United States v. Drayton,* 536 U.S. 194, 207, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) ("the totality of the circumstances must control").

Although "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures" by approaching individuals in public places and asking questions, *Drayton*, 536 U.S. 194, 200, 122 S.Ct. 2105, a consensual encounter becomes a seizure when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall,* 446 U.S. at 552, 100 S.Ct. 1870; *see also United States v. Peters*, 194 F.3d 692, 698 (6th Cir. 1999) ("Absent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled, the [officer's] request for additional identification and voluntarily given information from the defendant does not constitute a seizure under the Fourth Amendment."). Factors that, if present, indicate that a seizure occurred include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870.

Defendant argues that a reasonable person in his position would not have felt free to leave in light of Officer Hawk's actions. (Docket Entry No. at 39 at 3-5). Defendant first encountered Officer Hawk while Defendant was alone in a dark area. (*Id.*). Officer Hawk stopped his marked police car behind Defendant and then shined the police cruiser's spotlight onto Defendant. (*Id.*). Officer Hawk then allegedly told Defendant to "come here, come over here," gestured at Defendant to "come over'" and had his [right][3] hand on his weapon." (*Id.*).

---

[3] *See* (SH Transcripts at pp. 102-103). Officer Hawk testified that his gun was worn in a holster on his left side. (*Id.* at 28).

The Government counters that Officer Hawk was alone, did not activate his vehicle's emergency lights, and did not exit his vehicle with a weapon drawn. (Docket Entry No. 40 at 7). Contrary to Defendant's testimony, it is unclear how, or why, Officer Hawk would have placed his right hand on the weapon he carried on his left hip. (*Id.* at 7-8). Officer Hawk's testimony establishes that he did not encounter Defendant in an objectively confrontational manner. Rather, Officer Hawk requested that Defendant come over and speak to him. (*Id.*). Defendant complied and walked to the officer. (*Id.*).

The facts in this case demonstrate an initial non-confrontational, consensual encounter between Defendant and Officer Hawk. The "totality of the circumstances" here demonstrate that Defendant's freedom of movement was not restrained and he was not seized. In fact, as the investigator for the Federal Public Defender's Office testified, there were numerous pedestrian-only access points (wherein Defendant could have continued on his way unhindered instead of approaching the officer).

The nature of the encounter between Defendant and Officer Hawk changed, however, at the time the officer believed a weapon was being concealed. Officer Hawk testified that after the third time he commanded Defendant remove his hand from his pocket, he grabbed Defendant's right arm above the wrist "to make sure he didn't pull anything out." Defendant then began to struggle with the officer. Officer Hawk shoved Defendant against the hood of his car to regain control. At some point during the struggle, Officer Hawk radioed for back-up and Defendant dropped to the ground in front of Officer Hawk's police car. Undoubtedly, this physical confrontation constituted a seizure.

Consensual encounters sometimes turn into seizures based on the information uncovered or believed to be withheld. *See U.S. v. Ali*, 437 Fed. Appx. 439 (C.A.6, 2011) (describing a

consensual encounter between a police officer and an individual alleged to have stolen a cell phone, which spiraled into a seizure when a revolver became visible to the officer and a struggle over the weapon ensued); s*ee also Florida v. Royer,* 460 U.S. 491, 502–03, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (describing a consensual encounter in an airport terminal between police officers and an individual suspected of drug trafficking, which escalated into a seizure when the officers took the man to an interrogation room to confirm their suspicions).

"Once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." *United States v. Campbell,* 486 F.3d 949, 954 (6th Cir. 2007). *Terry* allows a very limited frisk of a citizen seized for brief investigation, but only when the officer "harbor[s] reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson,* 555 U.S. 323, 129 S.Ct. 781, 784, 172 L.Ed.2d 694 (2009). Even "despite the danger that inheres in on-the-street encounters and the need for police to act quickly for their own safety, ... *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie,* 494 U.S. 325, 334 n. 2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *Ali*, 437 Fed. Appx. 439 at 444.

The Fourth Amendment requires that all "searches and seizures be founded upon an objective justification," *Mendenhall,* 446 U.S. 551, 100 S.Ct., including brief, investigatory detentions known as *Terry* stops. *Terry*, 392 U.S. 1, 88 S.Ct. 1868. Uncertain of what Defendant may have possessed in his hand, Officer Hawk had a reasonable basis to believe Defendant to be armed and given the potential danger to the officer, was objectively justified in his attempt to physically remove Defendant's hand from his pocket. Defendant, who had his hands in his

pockets, was asked three times to remove his hands; Defendant, nevertheless, only partially complied by removing just one hand.

The Court concludes that under these circumstances Officer Hawk harbored reasonable suspicion that Defendant was armed and dangerous – requiring physical seizure of Defendant.[4] Consequently, suppression of evidence resulting from this lawful encounter would be inappropriate.

### III. CONCLUSION

On the basis of the foregoing, Defendant Richard Fletcher's *Motion to Suppress* (Docket Entry No. 21) will be denied.

An appropriate Order will be entered.

*Kevin H. Sharp*
_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[4] Defendant makes the argument that Officer misunderstood the trespassing laws in Tennessee. (Docket Entry No. 39 at 5-6). Defendant goes on to argue that the Sixth Circuit recognizes that "even good-faith mistakes of law ordinarily cannot support reasonable suspicion to conduct a stop, citing *United States v. Gross*, 550 F.3d 578, 585 n.2 (6th Cir. 2008)." (*Id.* at 11). As the Court concluded, Officer Hawk initiated a consensual encounter, wherein he obtained adequate legal justification for reasonable suspicion that Defendant was armed. Even if the stop had not fit the criteria of a consensual encounter, reasonable suspicion would have been evident since Defendant was committing criminal trespass in violation of T.C.A. § 39-14-405.